No. 88-118

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

IN RE THE MARRIAGE OF
ROBERT J. TURBES,

        Petitioner and Respondent,

   and

EDITH YVONNE TURBES,

        Respondent and Appellant.

---

APPEAL FROM: District Court of the Sixteenth Judicial District,
In and for the County of Custer,
The Honorable A.B. Martin, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Larry D. Herman, Laurel, Montana

    For Respondent:

        George W. Huss; Brown & Huss, Miles City, Montana

---

Submitted on Briefs: Aug. 11, 1988

Decided: September 27, 1988

Filed: SEP 27 1988

*Ethel M. Harrison*
Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Edith Turbes appeals from the February 3, 1988 judgment of the Custer County District Court dissolving her marriage to Robert Turbes and dividing their property. We affirm the judgment of the District Court but remand the case for payment of the temporary maintenance as previously ordered by the District Court.

Robert J. Turbes and Edith Yvonne Turbes were married on May 12, 1984. Their marriage lasted 34 months to the date of separation and three and one-half years to the date of trial. There were no children born of the marriage, though Robert's two children of a previous marriage lived with the parties in Cody, Wyoming, during the first year of the marriage. Both parties had been married previously.

Five years prior to their marriage, Robert Turbes was injured in an industrial accident, for which he received a net settlement of approximately $110,000. Mr. Turbes used portions of this settlement to construct a house which he owned free and clear at the time of the marriage ($58,000); to secure a loan to start a True Value lumber business (Turbes Lumber) ($40,000); and to purchase a Ford Bronco. Respondent held these assets, his personal belongings, and approximately $14,000 in cash at the time of the marriage.

Testimony of the husband placed his net worth at approximately $250,000 at the time the parties married. The wife's testimony established a net worth of approximately $4,000 at the time of the marriage. This consisted of a 1979 Fiat automobile, a savings account containing approximately $2,500 and her personal belongings. Evidence conflicted on the amount owing on these assets.

2

Approximately one year after the parties married, they sold the home Robert had built prior to marriage and proceeded to use the proceeds to construct a new home. Conflicting evidence was introduced as to the cost of materials and services which went into the house. At trial Robert produced a record showing the cost was approximately $95,000, while Edith testified she believed the cost was closer to $75,000 to $80,000. The parties obtained an $80,000 mortgage on the property placing the money obtained from the mortgage back into their account in anticipation of expanding Turbes Lumber. Both Robert and Edith contributed substantial amounts of their time to finishing the house, though Edith admitted Robert put in more time.

During the first two years of their marriage, Edith worked for Turbes Lumber. For her time, she was paid between $900 and $1,000 per month. She produced evidence at the hearing that she used a portion of her income to pay off the debts she brought to the marriage and some of their living expenses. Edith acknowledged that Robert contributed from his earnings at Turbes Lumber toward their living expenses.

In approximately June of 1986, the lumber company began experiencing financial problems and Edith went to work for Marathon Oil in Cody, Wyoming. Edith quit working for Marathon Oil in early August, 1986, and returned to Turbes Lumber where she worked without pay until Turbes Lumber was liquidated on August 16, 1986.

After liquidation of Turbes Lumber, approximately $20,000 remained owing on the loan Robert had taken out to finance the business. To secure payment of this obligation the parties executed a second mortgage on the marital home.

Prior to this time the parties had transferred their bank account of approximately $110,000 to Minnesota and placed it in Robert's brother's name. This was done in

3

anticipation of pending legal problems involving Turbes Lumber. The couple then moved to Minnesota, and borrowed $35,000 to start a business from a trust created by Edith's parents. This business opportunity fell through, and they returned the money borrowed from the trust. They moved to Portland, Oregon and then back to Cody, Wyoming. In January of 1987, the parties reached an accord and satisfaction where they deeded their house in Cody to the bank in lieu of foreclosure of the mortgages on the property. Robert then obtained work in Miles City, Montana, where the parties were living at the time of their separation on March 15, 1987.

Prior to the separation, Robert transferred approximately $104,000 from the joint bank account to a separate account in his name. When the parties separated, Edith removed most of their personal property and took both her Fiat automobile and the Ford LTD purchased during their marriage. Robert subsequently filed for dissolution of the marriage. Edith later received a check for stock which Robert had earned through Turbes Lumber's membership in True Value. She cashed the check in the amount of $1,389.77, but did not spend the money.

Pursuant to the District Court's temporary order of May 27, 1987, Robert was given possession of the Ford LTD with its accompanying debt, and Edith was given possession of the Ford Bronco. Edith was also ordered to return those personal property items of Robert's which she had taken.

The court heard the parties' dissolution action on December 18, 1987, and issued its decree of dissolution on February 3, 1988. The court awarded to Robert the following: the remaining monies in his bank account (approximately $98,000); the Ford LTD (along with its accompanying debt); the Ford Bronco; insurance proceeds from claims upon the vehicles; and that personal property which he brought to the

4

marriage. Edith received the proceeds from the sale of her Fiat and her personal possessions, but she was directed to return the proceeds of the check issued from True Value to Robert.

The following issues are presented for our consideration:

1. Did the District Court abuse its discretion in adopting the husband's proposed findings of fact and conclusions of law?

2. Did the District Court abuse its discretion in not considering the nonmonetary contributions of the appellant to the marriage and to the preservation of the marital assets?

3. Did the District Court abuse its discretion in not adjusting the property rights reasonably and equitably?

4. Did the District Court abuse its discretion by not considering the income tax consequences attendant to the accord and satisfaction of the mortgages?

In reviewing the issues presented on appeal of a property distribution, this Court's function is "extremely limited." In re Marriage of Hundtoft (Mont. 1987), 732 P.2d 401, 402, 44 St.Rep. 204, 205. "[T]his Court will reverse a district court only upon a showing that the district court has acted arbitrarily or has committed a clear abuse of discretion, resulting in either instance in substantial injustice." In re Marriage of Hall (Mont. 1987), 740 P.2d 684, 686, 44 St.Rep. 1321, 1323. If the District Court's findings of fact and conclusions of law properly address the considerations in § 40-4-202, MCA, this Court will not reverse the determination made by the District Court.

Issue #1.

Did the District Court abuse its discretion in adopting the husband's proposed findings of fact and conclusions of law?

5

This Court will uphold the district court if its decision is supported by the law and the evidence. In re Marriage of Sessions (Mont. 1988), 753 P.2d 1306, 1307, 45 St.Rep. 744, 746. In the case at hand, the District Court prefaced its adoption of the husband's findings by stating:

> It is not the usual practice of this court to adopt the proposed findings of fact or conclusions of law of counsel, but after hearing testimony, examining exhibits, and considering briefs of counsel, the Court adopts petitioner's proposed findings of fact and conclusions of law as follows:

This statement by the District Court shows the District Court did not adopt the petitioner's proposed findings haphazardly. The question for this Court is whether the adopted findings are supported by the law and the evidence.

Section 40-4-202, MCA, is the controlling statute for division of property in a dissolution action. This statute directs the court to divide the property equitably between the parties without regard to marital misconduct. The court must consider all assets owned jointly or individually, however or whenever acquired, regardless of the manner in which title is held. The court shall then consider the duration of the marriage, previous marriages, the earning potential of each party, their liabilities and their opportunities for future acquisition of capital assets and income. The court shall consider contributions to and dissipation of the parties' individual estates. When a court considers property acquired prior to marriage, as in this case, the court shall consider contributions of the other spouse to the marriage, including:

> (a) the nonmonetary contribution of a homemaker;

6

(b) the extent to which such contributions have facilitated the maintenance of this property; and

(c) whether or not the property division serves as an alternative to maintenance arrangements.

Section 40-4-202(1), MCA.

The following findings by the District Court illustrate due consideration of § 40-4-202(1), MCA: The court found that the marriage was of a short duration (34 months), that no children resulted from their union, both parties had marketable job skills, that neither had health problems affecting their employability, and that no antenuptial agreement existed. Further the court found that a bank account containing approximately $98,000 was the major existing asset at the time of dissolution. Substantial credible evidence was presented at trial which supports these findings and we hold that the District Court did not err in adopting these findings.

Appellant contends the District Court erred in awarding all the monies in the existing bank account to the husband and less than $2,000, representing temporary maintenance to the wife. Appellant first contends that the respondent did not bring cash into the marriage in the amount of $14,000. However, our review of the evidence and transcript shows the respondent did not spend the entire amount of his settlement. $40,000 was set aside to cover operating expenses of their business, however this money was not entirely spent. This is further evidenced by the fact that after sale of the premarital home one year into the marriage (netting $97,000) the parties' bank account showed a balance in excess of $115,000. Respondent testified this amount represented

7

proceeds from his personal injury settlement. Appellant's evidence does not disprove this claim.

Appellant next claims that she should have received $2,000 under the court's order for temporary maintenance, but actually only received $1,000. Appellant is correct in her claim and respondent admits Edith only received $1,000. However, this Court finds the error is correctable and does not arise to the level of reversible error.

The third error claimed by the appellant is that the bank account did not represent respondent's premarital personal injury settlement, but rather proceeds from the home the parties built. Here the court was presented with conflicting evidence on the cost of building the marital home, but both parties acknowledge that all the financing for the construction came from the proceeds of the husband's personal injury settlement and the proceeds of the sale of the premarital home. Both parties contributed their labor to the building of the home and the appellant admitted the husband spent more time in its construction. After examining the conflicting evidence on the cost of the marital home, the court adopted the husband's figures which approximated the amount of the loans on the home at the time it was deeded back to the bank in satisfaction of the mortgages. It is granted that $20,000 of this amount secured debts of the business after liquidation. Appellant has acknowledged, however, that the business provided her with a job, and that the parties used profits from the business, both before and after its liquidation, to live on. It is not unreasonable for the court to find she received a benefit from the business justifying her obligation. As the asset did not generate income or property for the parties, the court did not abuse its discretion in finding the appellant failed to generate a claim against the husband's premarital assets.

8

The final error claimed in the proposed findings is that the appellant had an irrevocable interest in a trust fund which provided her with the opportunity to generate future capital assets and income. While direct reference is not made to the existence of appellant's interest in the trust, evidence was introduced of its existence, the fact she could borrow against the trust and that the trust had been created by appellant's parents. Therefore, we do not find reversible error.

Having examined the record and the court's findings we do not find that the District Court abused its discretion. Issue #2.

Did the District Court abuse its discretion in not considering the nonmonetary contributions of the appellant to the marriage and to the preservation of the marital assets?

Appellant maintains the court should consider the nonmonetary contributions of a spouse when dividing the marital assets. This assertion is correct. See § 40-4-202(1), MCA; and Eschenberg v. Eschenberg (1976), 171 Mont. 247, 251, 557 P.2d 1014, 1016; In re Marriage of Dow (Mont. 1988), 750 P.2d 1064, 45 St.Rep. 317. In this case however, the court did consider the contribution of the appellant toward maintaining the marital assets. Unfortunately the court determined her contribution toward the marital assets were lost when the parties deeded back the marital home to the bank in satisfaction of the mortgages on the property. The husband's contribution of his time and effort was also lost at that time. Further, while the parties experienced a reduction in their net worth over the length of the marriage, the court appears to have attempted to return appellant to her maximum net worth at the time of the marriage. In light of the short duration of the marriage

9

and the reduction of the husband's premarital net worth this does not appear to be an inequitable division.

Issue #3.

Did the District Court abuse its discretion in not adjusting the property rights reasonably and equitably?

In her third issue, appellant maintains the court's division of the marital property is unfair in light of her contributions toward the marital assets. In essence this issue is a rehashing of the first two issues. In the case of In re Marriage of Keepers (Mont. 1984), 691 P.2d 810, 41 St.Rep. 2163, this Court stated:

> Reasonable minds could differ on what would be the most equitable distribution of the parties' property. That the case may be decided differently is not the inquiry on appeal, the question is whether the fact determination of the court below is clearly erroneous. Rule 52(a), M.R.Civ.P.

Keepers, 691 P.2d at 813, 41 St.Rep. at 2167.

In Keepers, as in this case, review of the record showed the District Court's findings contained an error. There this Court found the error did not result in a finding that the District Court clearly abused its discretion. The error we find in this case, the fact that Edith only received $1,000 of temporary maintenance, is correctable and does not constitute an abuse of discretion by the District Court.

Issue #4.

As its final issue, appellant raises the question of whether or not the District Court abused its discretion by failing to consider the tax consequences of the marital property distribution. The findings of fact and conclusions of law adopted by the lower court do not address the issue directly.

10

Appellant contends the lower court's distribution of the marital assets constitutes a "triggering" event, making her liable for state and federal income taxes on the accord and satisfaction of the marital home. This contention is without merit. The triggering event in this instance was the accord and satisfaction itself, which created any resulting tax liability at that time. "[W]here a property distribution ordered by a court includes a taxable event precipitating a concrete and immediate tax liability, such tax liability should be considered by the court before entering its final judgment." In re Marriage of Beck (Mont. 1981), 631 P.2d 282, 285, 38 St.Rep. 1054. But, "a District Court does not abuse its discretion by refusing to consider theoretical tax consequences when the court-ordered property distribution does not contemplate any taxable event which triggers present tax liability." Beck, 631 P.2d at 285, 38 St.Rep. at 1058. See In re Marriage of Gilbert (Mont. 1981), 628 P.2d 1088, 38 St.Rep. 743.

Finally, appellant failed to produce adequate evidence at the hearing upon which the court could make a determination of the existence of the tax consequences. The only evidence was testimony by the appellant that she would experience a taxable gain on the accord and satisfaction for the marital home. Appellant relied on her unsubstantiated belief on the cost of building the house, which conflicts with evidence presented by the husband. Because of the theoretical nature of the contention, we hold the court did not abuse its discretion by refusing to consider the tax consequences.

In light of our determination that the District Court was in error in finding appellant had received the $2,000 which had been ordered, but only received $1,000, we remand to the District Court to compel payment of the sum of $1,000

11

by respondent husband to the wife as previously ordered. Judgment affirmed, subject to the above procedure.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

12