

DA 12-0381

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 145

IN RE THE MARRIAGE OF:
JEAN SCHWARTZ,

      Petitioner and Appellee,

  v.

GREGORY ELY HARRIS,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DR-02-316(C)
Honorable Stewart E. Stadler, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          David F. Stufft; Attorney at Law; Kalispell, Montana

      For Appellee:

          Katherine P. Maxwell; Maxwell Law, PLLC; Kalispell, Montana

              Submitted on Briefs:  March 27, 2013

                    Decided:  May 30, 2013

Filed:

_____
               Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 The marriage of Gregory Harris (Greg) and Jean Schwartz, formerly known as Jean Harris (Jean), was dissolved by decree of the Eleventh Judicial District Court, which also divided the marital estate. On appeal, Greg challenges various aspects of the property division, including the selection of valuation dates, the identification and valuation of marital property, the division of assets, and the adjustments made in making the division, including an approximately $1.259 million equalization amount awarded to Jean. We affirm in part, reverse in part, and remand for further proceedings.

¶2 We restate and address the following issues:[1]

¶3 *1. Did the District Court err by valuing the estate as of 2009 instead of 2002, when the parties separated?*

¶4 *2. Did the District Court err in its valuation of the Grizzly Security businesses?*

¶5 *3. Did the District Court err by failing to award Greg an offset credit for the $400,000 paid to Jean between 2002 and 2009?*

¶6 *4. Did the District Court err by ordering that Greg pay a $1.259 million equalization payment to Jean without providing a method of payment?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶7 Greg and Jean were married in October 1988. Greg has ownership interests in Grizzly Security Armored Express, Inc. and related businesses, including Grizzly Security Alarms, Inc. and Grizzly Security ShredEx, Inc. (collectively "Grizzly Security businesses"). Greg is the sole owner of Grizzly Security Armored Express and owns

---

[1] Greg frames numerous issues on appeal, most of which are either encompassed within the four issues stated here, or supported by abbreviated arguments with little or no citation to authority. To the extent that Greg has raised issues not encompassed by the four issues stated here, we affirm the District Court's determination of those other matters.

one-half of Grizzly Security ShredEx and one-third of Grizzly Security Alarms. The Grizzly Security businesses are formed as subchapter S corporations and all of Greg's income from the businesses is directly taxable to Greg. In 1995, Greg sustained a head injury when he was assaulted while on work duty. This event has caused Greg memory loss and severe headaches. Jean and Greg have four children, three of whom are adults.

¶8 In June 2002, Jean filed for dissolution of the marriage. She entered into a contract to purchase a home later that year, and acquired the home in March 2003. Greg agreed to make the mortgage, tax, and insurance payments on Jean's behalf, and the mortgage was placed in his name alone. In December 2002, the District Court issued its Findings of Fact, Conclusions of Law and Order (Temporary Support Order). The Temporary Support Order required Greg to pay $2,000 to Jean per month in temporary family support in addition to paying for Jean's vehicle expenses, medical insurance for Jean and the children, and the children's extracurricular and medical costs. The Temporary Support Order did not reference Greg's commitment to pay the mortgage payments and costs on Jean's home.

¶9 A trial was ultimately conducted on September 20 and 21, 2010, and February 22, 2011. Jean testified that she participated in operating the Grizzly Security businesses during the marriage. She also stated that she and Greg had lived apart since 2002 and that Greg pays the mortgage on her home. Jean testified that Greg managed Jean's rental properties and provided Jean with other financial support, that she provided non-monetary support to Greg, and the parties had almost daily phone contact. She explained

3

that she and Greg traveled together to the children's sporting events, vacationed together, and gave the children joint Christmas and birthday gifts.

¶10 David Smith, one of Jean's experts, presented a complete appraisal for the Grizzly Security businesses as of December 31, 2009, using an income-based approach. Mr. Smith opined that Greg's share of the fair market value of the businesses was $2,584,700. James Kelley, a real estate expert, presented appraisal values for the parties' real property based on appraisals conducted in November 2009 and April 2010.

¶11 Greg testified that the Grizzly Security businesses have become less viable since the early 2000s and were losing some of its contracts. Greg also explained details about his personal and business debt and his inability to secure additional financing. Greg's accountant testified and the District Court admitted Greg's personal tax returns from 2001 through 2008 and tax returns for Grizzly Security from 2001 through 2009. Greg's business valuation expert, Todd Gardner, presented appraisals for the personal property of the Grizzly Security businesses for 2002 and 2010 using an asset appraisal method. Mr. Gardner said the appraisal value for the personal property of Grizzly Security Armored Express was $48,250 for 2002. Mr. Gardner testified that the total value of the personal property for Grizzly Security Armored Express, Grizzly Security Alarms, and Grizzly Security ShredEx in 2010 was $376,945.

¶12 The District Court entered the Findings of Fact, Conclusions of Law and Decree (Decree) on March 8, 2012. The Decree divided the marital assets, which included the parties' real property and the Grizzly Security businesses. The District Court used the

2009 income-based appraisal for the Grizzly Security businesses presented by Mr. Smith. The District Court granted the business interests to Greg and awarded Jean an equalization payment in the amount of $1,259,903. With regard to the actual distribution of assets, the District Court's Decree simply stated "[t]he parties shall cooperate and assist in the transfer of titles and possession necessary to accomplish the distribution set forth herein."

¶13 The day after the Decree was entered, Jean attempted to execute on the judgment against Greg. The clerk of court initially entered the writ of execution but later voided it because Jean had not waited 14 days as required by M. R. Civ. P. 62(a). Greg moved the District Court for a stay of judgment pending appeal, asserting by reference to bank letters declining to offer financing that he was unable to finance the equalization payment he was ordered to pay to Jean. No further writs of execution were issued before this appeal.

¶14 Greg filed a notice of appeal to this Court and also filed for bankruptcy in the United States Bankruptcy Court for the District of Montana. On November 15, 2012, the United States Bankruptcy Court entered an order modifying the automatic stay and permitting the parties to seek final determination of this appeal.

**STANDARD OF REVIEW**

¶15 "We review family law cases for valuation and allocation of marital property to determine whether the District Court's findings are clearly erroneous." *In re Marriage of Baide*, 2004 MT 260, ¶ 7, 323 Mont. 104, 99 P.3d 178. A finding is clearly erroneous if

5

it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court made a mistake. *In re Marriage of Williams*, 2009 MT 282, ¶ 14, 352 Mont. 198, 217 P.3d 67 (*Williams I*). If the findings are not clearly erroneous, we will affirm the division absent an abuse of discretion. *Williams I*, ¶ 14. "A district court abuses its discretion if it acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *In re Marriage of Alexander*, 2011 MT 1, ¶ 11, 359 Mont. 89, 246 P.3d 712; *see also Williams I*, ¶ 14. We review a district court's conclusions of law for correctness. *Williams I*, ¶ 14.

## DISCUSSION

¶16　*1. Did the District Court err by valuing the estate as of 2009 instead of 2002, when the parties separated?*

¶17　Greg argues that the District Court should have valued the marital property as of 2002, when the parties separated, rather than 2009. He notes that Jean filed the petition for dissolution in 2002, and both parties agreed that the marriage was irretrievably broken at that time. Greg asserts that he and Jean separated their assets and debts in 2002, and have since filed separate tax returns, lived in separate homes, and made separate financial decisions. Jean answers that the District Court did not err in using the 2009 valuation date because she and Greg "continued to act as a married couple in many respects both publicly and privately." Jean explains that Greg continued to manage Jean's rental properties, provided Jean with financial support, and that the parties continued to spend time together and had almost daily phone contact.

6

¶18 As a general rule, "the value of the marital estate should be determined at or near the time of dissolution." *In re Marriage of Swanson*, 220 Mont. 490, 495, 716 P.2d 219, 222 (1986). "Generally, valuing the property near the time of dissolution results in equitable apportionment, but unique circumstances may call for valuation at a different time." *Alexander*, ¶ 16 (citing *In re Marriage of Geror*, 2000 MT 60, ¶ 14, 299 Mont. 33, 996 P.2d 381). However, we have stated that equitable apportionment is more important than "designating the moment" at which the court should value marital property. *Alexander*, ¶ 18. Further, we have concluded that "the date of separation can be used as the appraisal date when one spouse accrued significant wealth and the other accrued significant debts after the parties had separated but before formal dissolution." *In re Marriage of Williams*, 2011 MT 63, ¶ 26, 360 Mont. 46, 250 P.3d 850 (*Williams II*). We have affirmed a district court's use of the date of separation where the parties "began managing their finances separately and eventually lived separately" from that time. *In re Marriage of Thorner*, 2008 MT 270, ¶ 37, 345 Mont. 194, 190 P.3d 1063; *see also In re Marriage of Tipton*, 2010 MT 144, ¶ 24, 357 Mont. 1, 239 P.3d 116.

¶19 The District Court found, based on facts testified to at trial, that Greg and Jean "continued a family relationship until May[] 2009, and that the proper date to value and distribute the marital estate is 2009." The District Court listed several other factors upon which it based its decision, including that Greg had voluntarily supported Jean from 2002 to 2009 by paying her mortgage. The District Court also found that Greg and Jean continued to function as a "family unit" because, among other things, they traveled and

7

vacationed together and gave the children joint Christmas and birthday gifts. The District Court's findings regarding the valuation date do not address whether either party accrued significant individual debt or wealth in the period between separation and dissolution—factors we noted in approving valuation of the estate at the time of separation in *Williams II*.

¶20 The Decree was filed in March 2012, and under general rules, the 2009 values would be most appropriate because they were closest to the time of dissolution. We are not persuaded that the circumstances here required use of the 2002 property values to avoid unfairness or inequity. The District Court's findings are not clearly erroneous and are supported by the record. Although the parties had been separated since 2002, we conclude on this record that the District Court did not abuse its discretion in using the 2009 property values in distributing the marital estate.

¶21 *2. Did the District Court err in its valuation of the Grizzly Security businesses?*

¶22 Greg challenges the District Court's adoption of Jean's expert's valuation of the Grizzly Security businesses. Jean argues that the District Court acted well within its discretion to accept Jean's business valuations.

¶23 A district court has discretion to adopt any reasonable valuation of marital property that is supported by the evidence. *In re Marriage of Hedges*, 2002 MT 204, ¶ 21, 311 Mont. 230, 53 P.3d 1273. We have stated that a district court's valuation of a business within a marital estate must be "a reasonable determination, supported by the record and within the range of values presented by the parties." *Baide*, ¶ 16.

¶24    Jean's expert, Mr. Smith, testified that Greg's share of the Grizzly Security businesses in 2009 based upon his income-based appraisal was $2,584,700. Greg's expert, Mr. Gardner, testified that the total value of the Grizzly Security businesses in 2009, using the asset appraisal method, was $376,945. The District Court adopted Mr. Smith's appraised values for the Grizzly Security businesses. While there was a wide divergence between the values of the businesses attributed by the parties—a circumstance we have previously described as "not surprising[]" in the context of disputed property valuation, *Hedges*, ¶ 22—the District Court was within its discretion to adopt one expert's valuation when supported by the record. A district court is "in the best position to judge the credibility of the testimony proffered by parties and witnesses" and "we will defer to its resolution of any conflicting evidence." *Hedges*, ¶ 22. The valuation of the Grizzly Security businesses adopted by the District Court is within the range of values presented by the parties, is supported by the record, and is reasonable. We conclude the District Court did not abuse its discretion or clearly err in valuing the businesses.

¶25    *3. Did the District Court err by failing to award Greg an offset credit for the $400,000 paid to Jean between 2002 and 2009?*

¶26    Greg argues that "[a]lthough[] the Court acknowledges that Greg paid in excess of $400,000 since the parties separated in 2002[,] Greg did not receive a credit for this payment. That is not equitable." Jean replies that "[m]uch of the money allegedly paid to Jeanie was temporary family support, ordered by the court in 2002," and that although

9

"sums were expended in paying the mortgage on Jeanie's home," the equity in the home "is shared by both parties in the division of property."

¶27 In accordance with the Temporary Support Order, Greg paid $2,000 per month in family-support cash payments to Jean, and paid for Jean's vehicle, the family's health insurance, and the children's activities during the years the parties were separated. In addition to this ordered support, Greg also paid the costs of Jean's housing, which, as far as the record demonstrates, Greg continued to pay until the dissolution decree was entered. For the years between 2002 and 2009, Greg calculated these payments to be approximately $115,000. Jean thus received, beginning in 2002, a housing benefit at Greg's expense of the principal and interest payments, taxes, and insurance, and ultimately received the house with the equity that Greg's servicing of the debts and payment of the expenses made possible.[2] These housing expenses were not mandated by the Temporary Support Order, and Greg made them voluntarily. These payments are included within the approximately $400,000 that Greg claims to have paid to Jean.

¶28 The District Court acknowledged that Greg paid "in excess of $400,000" to Jean, but did not specifically delineate how this amount factored into the District Court's apportionment of the marital estate.[3] In our analysis of the payments making up the $400,000, it is clear that most of those funds were paid in support of Jean and the

---

[2] The District Court determined that Jean's house had an appraised value of $270,000, and that the mortgage secured a debt in the amount of $161,000.

[3] The District Court made a passing reference to Greg's payment of $400,000 in its discussion of Jean's excess compensation claim, which it rejected as vague and subjective. However, the District Court made no specific connection or offset between these two claims.

10

children pursuant to the Temporary Support Order. These payments were for ongoing support of the family during the long period of marital separation and we find no reason to conclude that the District Court erred by not granting a specific credit to Greg for those payments.

¶29    However, beyond the support payments, Greg also provided cost-free housing for Jean that she enjoyed over many years and, further, by these efforts prudently created a sizeable, appreciable asset for her benefit. As a matter of equitable distribution, we conclude that Greg should have received a credit against his overall obligation to Jean for the post-separation housing payments he voluntarily made, beginning March 2003 through the date the Decree was entered. While such a credit may seem inconsistent with the determination to value the estate as of 2009, and with the inclusion of the house within the estate, Greg's provision of Jean's separate housing was likewise contrary to the premise that the parties were functioning as a normal family unit during these years, and the expense was above and beyond the obligations imposed upon Greg by the Court during the lengthy separation period.

¶30    Upon a determination that the district court has erred in distributing the marital estate, we have previously remanded with instructions directing the court how to equitably reapportion the marital estate. *See e.g., Williams I*, ¶¶ 40, 45; affirmed in *Williams II*, ¶¶ 6, 8; *Baide*, ¶ 18. Greg calculated the amount paid for Jean's housing to be about $115,000, but a specific factual determination in that regard was not made. Thus, on remand, the District Court should specifically calculate the amount Greg paid

for Jean's housing between 2003 and the entry of the Decree in 2012, and grant a credit in that amount toward the equalization payment he owes to Jean.

¶31    *4.    Did the District Court err by ordering that Greg pay a $1.259 million equalization payment to Jean without providing a method of payment?*

¶32    Greg asserts that the large equalization payment ordered by the District Court makes it "economically not feasible for Greg to pay the $1.259 million judgment" and that he has been forced to file for bankruptcy as a result of the obligation. Greg argues further that even if the assets of his businesses were sold, the net value of the assets after paying the debt would not generate enough revenue to pay the judgment and the statutory 10% interest per annum. Jean argues that the District Court gave Greg autonomy in deciding how the equalization payment should be paid.

¶33    We have previously held that a district court should allow a reasonable amount of time for a party to pay a monetary award in a property settlement. *Baide*, ¶ 18. This Court also considered the implications of a deferred monetary award in *In re Marriage of Westland*, 257 Mont. 169, 848 P.2d 492 (1993). The district court in *Westland* rejected the husband's proposed $50,000 annual equalization payments because the wife would have no assurance of receiving her annual payment. *Westland*, 257 Mont. at 172, 848 P.2d at 494. The district court expressed concern that the husband could potentially transfer assets to the wife's detriment or file for bankruptcy and discharge his debt. *Westland*, 257 Mont. at 172, 848 P.2d at 494. The wife's future payments would be unsecured. *Westland*, 257 Mont. at 172, 848 P.2d at 494.

12

¶34 However, even taking into account the concerns articulated in *Westland*, a deferred monetary award may be appropriate in some situations. A noted treatise on marital property distribution provides the following instruction:

> In the relatively common situation where a monetary award is used to award the nonowning spouse part of the value of a business, the award should not be so large as to interfere with the business' future profitable operation.
>
> It is not error per se to make an award greater than the payor's liquid assets, if the payor can sell or refinance property to meet the obligation. Such an award is not ideal, however, for there are various disadvantages to compelling sale in the divorce case. Most importantly, sale requires payment of capital gains costs, commissions, and other expenses, and property often fails to earn full value when sold under the pressure of divorce. Because of these disadvantages, an immediate monetary award which exceeds the value of the payor's liquid assets is a remedy of last rather than first resort. A better option would be division in kind (if division can be accomplished without violating the rule against co-ownership), or a monetary award deferred over sufficient time for liquid funds to be accumulated without sale. If the payor cannot reasonably sell assets or borrow liquid funds to pay an immediate monetary award, the making of such an award is error.

Brett R. Turner, *Equitable Distribution of Property* vol. 3, § 9.9, 31-33 (3d. ed., West 2005). In the right circumstances, a deferred monetary award may be preferable to an ordered sale of assets, particularly where the assets of the estate do not permit a division of property in kind or an immediate monetary award. Turner, *Equitable Distribution of Property* vol. 3, at § 9.10, 36. In cases where a deferred monetary award is the preferable method to distribute the marital estate, the district court should endeavor to state a sum certain,[4] provide for a certain and specific payment schedule over a reasonable period of

---

[4] *See* M. R. Civ. P. 58.

13

time,[5] be secured,[6] and include interest on the award. *See generally* Turner, *Equitable Distribution of Property* vol. 3, at § 9.10, 37-45 (citing cases). While a financial obligation imposed by a decree that is silent regarding interest is subject to the 10% statutory interest rate under § 25-9-205, MCA, the district court retains discretion to set an alternate rate of interest. *See Thorner*, ¶ 49; *Hedges*, ¶ 24. If the district court sets an interest rate that varies from the statutory rate, it must be fair and reasonable. *In re Marriage of Gibson*, 206 Mont. 460, 466, 671 P.2d 629, 633 (1983) ("[O]nce a person is liable for a money judgment and payment is not made, the person entitled to the judgment is further entitled to a fair rate of interest.") (discussing *Knudson v. Knudson*, 191 Mont. 204, 208, 622 P.2d 1025, 1027 (1981)); *see also* Turner, *Equitable Distribution of Property* vol. 3, at § 9.10, 42-43.

¶35 After review of the record, we conclude that Greg's request for a deferred monetary award with a payment plan is justified under these circumstances. Greg would otherwise be faced with selling the assets of his businesses in order to satisfy the judgment, thereby losing the bulk of the marital estate distributed to him and undermining his future ability to earn an income. The provision of the Decree merely

---

[5] *See e.g. McAvoy v. McAvoy*, 662 So. 2d 744 (Fla. Dist. Ct. App. 5th Dist. 1995) (payment schedule required in $59,805 lump sum equitable distribution); *Haren v. Haren*, 922 N.E.2d 284 (Ohio App. 2009) (trial court erred by not providing guidance stating when equalization payment was to be made).

[6] *See e.g. Head v. Head*, 714 So. 2d 231, 240-41 (La. Ct. App. 2d Cir. 1998) (requiring husband to sign secured promissory note with acceleration clause to secure deferred equalization payment); *Jayaram v. Jayaram*, 62 A.D.3d 951, 954, 880 N.Y.S.2d 305, 308 (N.Y. App. 2009) (requiring husband to obtain life insurance to secure remaining amount of distributive award).

providing that "[t]he parties shall cooperate and assist in the transfer of titles and possession necessary to accomplish the distribution set forth herein" fails to provide a sufficient framework for implementing the distribution of the estate. A structured payment plan would provide finality in the equitable division of the marital estate as required by § 40-4-202(1), MCA. *Williams II*, ¶ 27.

¶36 Given the large equalization payment the District Court found appropriate to award to Jean, the apparent difficulty in securing financing for such a payment, and the lack of guidance provided by the Decree, we conclude it is appropriate to remand to the District Court for adoption of a reasonable payment plan consistent with the guidelines for implementation of such plans within dissolution of a marital estate, as discussed herein.

## CONCLUSION

¶37 On remand, the District Court should calculate the amount Greg has expended for Jean's housing, as stated in ¶ 30, and credit that amount toward the equalization payment Greg owes to Jean. The District Court should also implement a reasonable payment plan for Greg's equalization obligation to Jean, as provided herein. It is not intended that this remand will require a reapportionment or redistribution of the entire marital estate, although the District Court is not precluded from making minor adjustments in distribution if necessary to implement this opinion. It is within the District Court's discretion to hold an additional hearing or to decide these issues upon the current record, if sufficient.

¶38    Affirmed in part, reversed in part, and remanded to the District Court for further proceedings in accordance herewith.


/S/ JIM RICE


We concur:


/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ LAURIE McKINNON
/S/ BRIAN MORRIS

16